UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

REISHA OVERSTREET,

                Plaintiff,

      v.

WAYNE COUNTY SHERIFF
BARRY C. VIRTS, et. al,

                Defendants.
_____

<u>DECISION & ORDER</u>

14-CV-6582P

## <u>PRELIMINARY STATEMENT</u>

Plaintiff Reisha Overstreet ("Overstreet") has sued Wayne County ("County"), its Sheriff, Barry C. Virts ("Virts"), four correctional officers, Leslie DeWind ("DeWind"), Jacqueline Thompson ("Thompson"), a female officer named Wilson ("Wilson"), and a John Doe Officer, and five members of the Wayne County Jail medical staff, Bernice Miller ("Miller"), RN, Mary Santelli ("Santelli"), RN, a nurse named Lisa, a Jane Doe nurse, and Peter Crane ("Crane"), MD, alleging constitutional claims under 42 U.S.C. § 1983 and various state law claims. (Docket # 1). The claims arise from Overstreet's incarceration at the Wayne County Jail between September 5, 2012 and September 12, 2012.

Currently pending before the Court is defendants' motion for summary judgment. (Docket # 37). Pursuant to 28 U.S.C. § 636(c), the parties have consented to have a United States magistrate judge conduct all further proceedings in this case, including the entry of final judgment. (Docket # 13).

# FACTUAL BACKGROUND

## I.      Overstreet's Incarceration

The following facts appear undisputed except where otherwise noted.  Overstreet was arrested and detained in the Wayne County Jail (the "Jail") on September 5, 2012.  (Docket ## 37-38 at ¶ 1; 44 at ¶ 1).  At the time of her incarceration, Overstreet was eighteen years old and had not previously been incarcerated.  (Docket # 43-7 at ¶¶ 3, 7).  Overstreet was assigned to the K-2 area of the Jail, an area for incarcerated minors segregated from the adult population. (Docket ## 1 at ¶¶ 39-40; 7 at ¶¶ 39-40; 37-38 at ¶ 2; 44 at ¶ 2).

The following morning, Miller, the facility nurse, performed a medical intake evaluation of Overstreet.  (Docket ## 37-38 at ¶¶ 47, 51; 44 at ¶¶ 47, 51).  During this process, a pregnancy test was administered and yielded a positive result.  (*Id.*).  Overstreet was visibly upset by the news and worried about her mother's reaction.  (Docket ## 37-38 at ¶ 52; 44 at ¶ 52).  The parties dispute whether standard practice at the Jail dictated that pregnant inmates be referred for mental health treatment, but they do not dispute that Overstreet was referred to and met with the Jail's social worker, Nicole Chaffin ("Chaffin").  (Docket ## 37-38 at ¶¶ 15, 53-54; 44 at ¶¶ 15, 53-54).  Miller also scheduled Overstreet to be seen the following morning, Friday, September 7, 2012, by either the Jail's medical doctor, Crane, or its physician assistant, Thomas Fletcher ("Fletcher").  (Docket ## 37-38 at ¶ 56; 44 at ¶ 56).

According to Overstreet, Chaffin arranged for Overstreet to speak to her mother, who assured her that she would soon be bailed out of the jail.  (Docket # 43-7 at ¶ 16).  She further alleges that her conversation with Chaffin caused her to believe that a "safety plan" was established to address her physical and mental health, and that she was to notify any corrections

officer immediately if she had any urgent problems.[1]  (Docket ## 43-7 at ¶¶ 17-18; 44 at 10, ¶ 15).

Pursuant to the Jail's policy, any inmate who wished to be seen by medical personnel for a non-emergency medical issue was required to complete a form, known as the Inmate Common Form (the "Common Form"), which would be reviewed by medical staff within twenty-four hours after submission.  (Docket ## 37-38 at ¶ 12; 44 at ¶ 12).  Defendants maintain that completion of the Common Form was not required where a corrections officer believed an inmate required immediate medical attention; under those circumstances, the officer was to contact their supervisor or medical staff or send the inmate to an outside emergency medical department.  (Docket # 37-38 at ¶ 13).  Overstreet disputes the existence of any written Jail policy that authorized the waiver of the Common Form requirement or the existence of any formal guidance provided to corrections officers to assist them in determining whether a particular medical condition was urgent and required immediate attention.  (Docket # 44 at ¶ 13).

Based upon her conversation with Chaffin, Overstreet understood that any urgent problems should be reported directly to a corrections officer and any non-urgent mental health issues should be reported using the Common Form.  (Docket # 43-7 at ¶ 18).  She also believed that the Jail staff would be informed of her "safety plan."  (*Id.*).  According to Overstreet, the Jail staff was aware that she had never been incarcerated, was pregnant, and had a history of drug use and smoking.  (Docket # 44 at 10, ¶¶ 8-13).

On the morning of September 7, Overstreet was escorted to the Jail medical department to be seen by Miller and Fletcher.  (Docket ## 37-38 at ¶ 59; 44 at ¶ 59).  As part of

---

[1]  In opposition to defendants' motion for summary judgment, Overstreet submitted a counter-statement of material facts, to which defendants did not reply.  (Docket # 44 at 9-13).  During oral argument, counsel for defendants stated that the lack of a reply did not mean that they did not dispute those facts.

the standard inmate intake process, Miller administered a tuberculosis ("TB") test to Overstreet and filled out a corresponding TB test sheet form.[2] (Docket ## 37-38 at ¶¶ 59-60; 44 at ¶¶ 59-60). Fletcher examined Overstreet, who reported no pregnancy-related issues, but did complain of hives, for which Fletcher prescribed Benadryl. (Docket ## 37-38 at ¶¶ 61-63; 44 at ¶¶ 61-63).

The parties dispute the events that occurred during the remainder of Overstreet's incarceration. According to Overstreet, she began to experience vaginal bleeding accompanied by headache on September 8, 2012. (Docket ## 43-7 at ¶ 22; 44 at 11, ¶ 16). Overstreet informed a male corrections officer that she was pregnant, bleeding, and needed to see a nurse right away. (Docket ## 43-7 at ¶ 22; 44 at 11, ¶ 17). The officer informed her that she would need to complete the Common Form and, because the form would need to be approved by a Sergeant, she likely would not be seen by a nurse for at least a week. (Docket ## 43-7 at ¶ 22; 44 at 11, ¶¶ 17, 21-22). Overstreet asserts that she informed other corrections officers about her condition throughout the rest of the day and assumed those officers would communicate with medical staff pursuant to her safety plan. (Docket # 43-7 at ¶¶ 22-24). She also spoke to an individual who distributed Benadryl to her, whom she thought was a nurse. (*Id.* at ¶ 23). According to Overstreet, she explained to that person that she was bleeding, but the individual responded that she was too busy to assist and did not return or follow up on Overstreet's concerns. (*Id.*). Overstreet also asked corrections officers to supply her with sanitary napkins and requested to be seen by medical personnel. (*Id.* at ¶ 24). Although corrections officers,

---

[2] A TB test consists of two parts. (Docket ## 37-38 at ¶ 57; 44 at ¶ 57). First, tuberculin is injected into an individual's forearm. (*Id.*). Second, after approximately 48-72 hours, the injection site is examined for the presence or absence of localized swelling, which indicates whether the result is positive or negative. (*Id.*).

including DeWind, supplied her with sanitary napkins, she was not seen by any medical personnel on September 8. (Docket # 44 at 11, ¶¶ 18-19).

The following day, September 9, Overstreet continued to experience discomfort and bleeding. (Docket # 43-7 at ¶ 25). She was again told to fill out the Common Form. (Docket ## 43-7 at ¶ 25; 44 at 11, ¶¶ 21-22). According to Overstreet, Wilson told her that she could be having a miscarriage or just be spotting. (Docket ## 43-7 at ¶ 26; 44 at 11, ¶¶ 21-20). Overstreet requested and received more sanitary napkins and was told to fill out the Common Form, but did not meet with any medical staff. (Docket # 43-7 at ¶ 26). Overstreet did not fill out the Common Form; she alleges that she did not complete one because she believed she would be released from the Jail within a few days and certainly before the end of a week. (*Id.*). She asserts that she expected her mother to post bail imminently and, in any event, expected to be ordered released at her September 12 court appearance. (*Id.*).

According to Overstreet, she continued to experience vaginal bleeding the next day and repeatedly asked that medical personnel see her or at least be informed of her condition. (Docket # 43-7 at ¶ 27). In response, corrections officers gave her more sanitary napkins and advised her to complete the Common Form. (*Id.*). Overstreet contends that she did not meet with Miller on September 10. (*Id.* at ¶ 28). Overstreet's mother visited her that evening and indicated that she might be able to post bail the following day. (*Id.* at ¶ 29).

Overstreet continued to experience vaginal bleeding on September 11 and received the same response when she informed various corrections officers of her condition – she was given sanitary napkins and advised to fill out the Common Form. (*Id.* at ¶ 30). Overstreet did not complete the Form because she believed that it would not secure medical attention for

another week and she anticipated being released from the Jail the following day. (*Id.*).

Overstreet denies that she saw Miller on September 11.[3] (*Id.* at ¶ 31).

According to Overstreet, on September 12, 2012, she was transported for her court appearance and ordered released. (*Id.* at ¶ 32). After her appearance, she was returned to the Jail to complete paperwork and collect her belongings. (*Id.*). Overstreet contends that she saw Miller there for the first time since the morning of September 7. (*Id.*). Overstreet informed Miller that she had been trying to see her and had been experiencing bleeding for several days. (Docket ## 43-7 at ¶ 32; 44 at 12, ¶ 26). According to Overstreet, Miller responded, "It's probably just a miscarriage and it will pass." (Docket ## 43-7 at ¶ 32; 44 at 12, ¶ 26). Overstreet maintains that Miller's response led her to believe that miscarriage was inevitable, further medical care would have little value, and the natural process of miscarriage posed no serious danger to her health or required no medical supervision. (Docket # 43-7 at ¶¶ 33-34).

Defendants counter that every corrections officer on K-2 duty during Overstreet's incarceration has denied that she ever informed them that she was pregnant or experiencing vaginal bleeding. (Docket ## 37-5; 37-6; 37-7; 37-8; 37-9; 37-10; 37-11; 37-12; 37-13; 37-14; 37-15; 37-16; 37-17; 37-18; 37-19; 37-20; 37-21; 37-37 at 19). The officers testified that had they been informed of Overstreet's condition, they would have dispensed with the Common Form and immediately reported her condition. (*Id.*). They also contend that they would have noted in a log book if Overstreet had declined to complete the Common Form. (*Id.*).

---

[3] Overstreet has submitted an affidavit from Karie Keech, an individual who was incarcerated in the K-2 section of the Jail during the relevant period. (Docket # 43-8). Keech maintains that she overheard Overstreet repeatedly report to corrections officers that she was bleeding and request feminine napkins. (*Id.*). She also maintains that she heard Overstreet report her condition to Miller. (*Id.*). The parties dispute the admissibility of Keech's affidavit, and I find that the factual allegations in the affidavit are immaterial to resolution of defendants' motion. Accordingly, I decline to consider the Keech affidavit on this motion.

Miller maintains that she met with Overstreet on Monday, September 10, 2012, at approximately 9:00 a.m., to examine her forearm to determine the results of the TB test that had been administered the previous Friday. (Docket # 37-38 at ¶ 64). According to Miller, the TB test was negative, and she recorded the results on the TB Test sheet and signed the form. (*Id.* at ¶¶ 64-65). Miller contends that Overstreet never mentioned any pregnancy-related issues or informed Miller that she was experiencing vaginal bleeding. (Docket # 37-31 at ¶ 20).

Miller asserts that she again saw Overstreet the following morning, September 11, 2012, during the medication pass (the "Med Pass"), the procedure for dispensing medication to inmates. (Docket # 37-38 at ¶¶ 66-67, 69). The parties agree that Miller's normal practice was to conduct Med Pass upon her arrival each morning and that a duty corrections officer performed it when Miller was absent or unavailable. (Docket ## 37-38 at ¶¶ 67-68, 71; 44 at ¶¶ 67-68, 71). According to Miller, she distributed Benadryl to Overstreet on September 11, and Overstreet did not make any pregnancy-related complaints or indicate that she was experiencing vaginal bleeding. (Docket ## 37-31 at ¶¶ 21, 23-24; 37-38 at ¶¶ 69-70). Miller denies that she interacted with Overstreet on September 12, 2012, or that she discussed vaginal bleeding with Overstreet. (Docket # 37-31 at ¶¶ 28-29).

## II.    Jail Policies and Records

The Jail's policies relating to sick call and emergency sick call during Overstreet's incarceration provided, in relevant part, as follows:

1.    Prisoners access to routine sick call:

   A.    On a daily basis, prisoners will have the ability to complete an Inmate Common Form requesting to be seen at sick call.

B.  All Common Forms addressing a medical problem or concern will be placed in the designated medical's mailbox located in the reception area, retrieved daily by medical staff.

C.  Sick call requests will be reviewed by Medical Staff within 24 hours, and then triage[d] to sick call.

D.  The sick call roster will be completed by Medical Staff.

4.  Emergencies

A.  Any staff member who has reason to believe any prisoner is in need of immediate medical attention will:

1) Contact the Shift Supervisor and/or medical staff directly.

B.  When medical staff is unavailable, the Shift Supervisor will:

1) Evaluate the complaint and report pertinent information to the Facility Physician or appropriate medical staff as soon as possible for prescriptions, orders and/or transfer to an appropriate health care facility.

(Docket # 37-30 at ¶ 5 and Exhibit ("Ex.") A).

The Jail's policies relating to pregnant inmates provided, in relevant part, as follows:

1.  Correction Officers will attempt to determine the pregnancy status of prisoners during the admissions program.

2.  If a prisoner is thought to be pregnant, the Facility Medical Staff will be notified immediately.  If not available, a Shift Supervisor will be notified.

3.  Pregnant prisoners will receive regular prenatal care, including:

      A.  Medical examinations

      B.  Advice on levels of activity

      C.  Safety precautions

      D.  Nutrition guidance; and

      E.  Counseling[.]

4.     Medical Staff will assist correction staff in determining:

      A.  Special diets, if appropriate

      B.  Special housing, if appropriate (e.g., lower tier as opposed to upper deck); and

      C.  Any other unique medical needs[.]

5.     Medical Staff will determine any special counseling needs and arrange for them, to include but not limited to:

      A.  Appropriate community agencies; or

      B.  Other county department agencies[.]

6.     Facility Medical Staff will contact the prisoner's private doctor or health care giver, if known, to coordinate the prisoner's medical care during incarceration.

(*Id.*).

The Jail's policies relating to supervision of inmates provided, in relevant part, as

follows:

8.     Any unusual event or significant problem occurring during supervision shall be entered in the logbook (even if an incident report is filed) and shall include:

      A.  The date and time of such event or problem.

      B.  The names of all prisoners and/ or staff involved.

      C.  Facility staff response to such event or problem, including a summary of what occurred.

D. A description of the condition of any prisoners involved.

(*Id.*).

In support of their motion for summary judgment, defendants have submitted Jail medical records and log book entries relating to Overstreet. For example, they have submitted the K-2 log book entries from the period September 8, 2012 through September 12, 2012. (Docket # 37-32 at 7-17). The entries contain information reflecting, among other things, transportation of inmates to other areas within the Jail and the completion of Med Pass. (*Id.*).

Corrections officers recorded information in the log books in different ways. For example, three corrections officers testified that they recorded the nurse's performance of Med Pass; the absence of such notation meant that the duty corrections officer had performed it. (Docket # 42 at Ex. H at 7, Ex. O at 11-12, Ex. Q at 9). By contrast, the corrections officer on duty on September 11, 2012 – the day that Miller maintains she distributed Benadryl to Overstreet – stated that she did not necessarily record whether Med Pass was conducted by a nurse and that the absence of such a notation did not mean that a duty officer (rather than the nurse) had performed it. (Docket # 48-5 at ¶ 5). In fact, the corrections officer indicated that if she had performed the Med Pass instead of the nurse, she would have noted that in the log. (*Id.*).

Defendants have also provided the TB Test record for Overstreet. (Docket # 37-31 at ¶¶ 16, 19 and Ex. C). The test sheet was signed by Miller and indicates that the test was administered on September 7, 2012, at 9:30 a.m., and the results were read on September 10, 2012, at 9:00 a.m. (*Id.* at ¶ 19 and Ex. C). As Overstreet notes, the testing results and date of the reading are transposed on the form. (Docket ## 37-31 at Ex. C; 45 at 18).

Defendants have also submitted the "MARS" or Med Pass sheets for the K-2 inmates, including Overstreet, for the relevant period. (Docket ## 37-31 at ¶ 23 and Ex. F; 48-4

at ¶ 8 and Ex. A). According to Miller, a MARS sheet was maintained for each inmate to record each occasion on which medication was dispensed to the inmate. (Docket # 37-31 at ¶ 22). The MARS sheet for Overstreet indicates that on September 11, 2012, at 7:00 a.m., diphenhydramine (commonly referred to as Benadryl) was dispensed to Overstreet by an employee with the initials "BM." (*Id.* at ¶ 23 and Ex. F). Miller maintains that the initials are hers and accurately reflect that she distributed the Benadryl to Overstreet on September 11. (*Id.* at ¶ 23). Miller indicates that her initials appear on the MARS sheets for all K-2 inmates who received medication that morning. (Docket # 48-4 at ¶ 8 and Ex. A).

As indicated above, Overstreet denies that she saw Miller on September 10 or 11, 2012. (Docket # 43-7 at ¶¶ 28, 31). Overstreet argues that Miller's records and self-serving testimony need not be credited. (Docket # 45 at 25-26). Overstreet emphasizes that Miller was unable to recall where in the Jail the TB results examination of Overstreet's forearm occurred and that the Jail's log book neither documents that Miller was present on K-2 the morning of September 10, 2012, nor that Overstreet was transported to the medical office that day. (Docket ## 42 at ¶ 7 and Ex. B; 45 at 18). Overstreet also observes that the absence of a log book entry documenting a nurse's involvement in Med Pass on September 11, 2012, suggests that it may have been performed by the duty corrections officer. (Docket ## 42 at ¶ 7 and Ex. B; 45 at 19).

In her opposition to the motion, Overstreet has submitted records of employment-related misconduct by Miller. (Docket ## 44 at 12-13, ¶¶ 27-33; 44-1; 44-2). The records reflect that the New York State Department of Education issued an administrative warning to Miller for unprofessional conduct arising from her failure to document properly information relating to inmate care on or about September 11, 2012. (Docket ## 42 at ¶ 15 and Ex. J; 45 at 15-16). The records also show that Miller was convicted on March 19, 2007, of

falsifying business records in the second degree relating to her job as a registered nurse in a nursing home.  (Docket ## 42 at ¶ 16 and Ex. K; 45 at 22-23).

## III.     Medical Treatment After Release

The facts relating to the treatment Overstreet received after she left the Jail are undisputed unless otherwise noted.  The day after her release from the Jail, on September 13, 2012, Overstreet contacted Auburn Obstetrics and Gynecology ("AOG") and left a message. (Docket ## 37-38 at ¶ 73; 44 at ¶ 73).  Later that day, a member of AOG's staff returned her call, and Overstreet explained that she had had a positive pregnancy test on September 6, 2012, started bleeding on September 8, 2012, continued to bleed with a light to moderate flow, and had been told by Jail staff that she might be having a miscarriage.  (Docket ## 37-27; 37-38 at ¶ 74; 44 at ¶ 74).  On September 14, 2012, a member of AOG's staff instructed Overstreet to obtain two quantitative bHCG blood tests[4] at an outpatient laboratory and advised her to go to the emergency department if her blood flow increased, she experienced severe pain or fever, or passed blood clots.  (Docket ## 37-27; 37-38 at ¶ 75; 44 at ¶ 75).

AOG staff contacted Overstreet on September 17, 2012, and Overstreet reported that she had not yet obtained any bloodwork but would go to the laboratory the following day. (Docket ## 37-27; 37-38 at ¶ 77; 44 at ¶ 77).  Overstreet also reported that she was no longer experiencing vaginal bleeding.  (Docket ## 37-27; 37-38 at ¶ 77; 44 at ¶ 77).  Overstreet's laboratory results indicated that she had a bHCG level of 1,633 on September 18, 2012.  (Docket ## 37-27; 37-38 at ¶ 79; 44 at ¶ 79).  Overstreet spoke with AOG staff on September 19, 2012,

_____

[4] Human chorionic gonadotropin ("HCG") is a hormone that increases over time during a viable human pregnancy.  (Docket # 37-38 at ¶ 91).  Blood tests measuring the levels of this hormone are used to confirm pregnancy and to assist in diagnosing any pregnancy abnormalities.  (*Id.*).

and was informed that it was impossible to determine how advanced the pregnancy was without another blood draw. (Docket ## 37-27; 37-38 at ¶ 80; 44 at ¶ 80). Overstreet responded that she did not plan to keep the pregnancy, at which time she was provided information for Planned Parenthood in Syracuse. (Docket ## 37-27; 37-38 at ¶ 82; 44 at ¶ 82). Overstreet did not obtain a second bHCG level at that time. (Docket ## 37-27; 37-38 at ¶ 81; 44 at ¶ 81).

Overstreet's mother contacted Planned Parenthood to schedule an appointment and was instructed that Overstreet should go to the emergency department if she passed any large blood clots. (Docket ## 37-38 at ¶¶ 83-84; 44 at ¶¶ 83-84). Overstreet attended an appointment at Planned Parenthood on September 25, 2012. (Docket ## 37-38 at ¶ 85; 44 at ¶ 85). At the appointment, a second quantitative bHCG blood test was administered, and an ultrasound was performed, which did not demonstrate a visible intrauterine pregnancy. (Docket ## 37-28 at 8-9; 37-38 at ¶¶ 86-87; 44 at ¶¶ 86-87). Overstreet was warned about an ectopic pregnancy[5] and advised to follow up pending results of her bloodwork. (Docket # 37-28 at 8-9).

The following day, Planned Parenthood informed Overstreet that her bloodwork indicated that her bHCG level was 8,849, which suggested an ectopic pregnancy, and advised her to go to the emergency department. (Docket ## 37-28 at 7, 16; 37-38 at ¶¶ 86-88; 44 at ¶¶ 86-88). Overstreet went to the emergency department at Crouse Hospital; an ectopic pregnancy was confirmed, and Overstreet underwent surgery to remove her entire left fallopian tube. (Docket ## 37-28 at 7; 37-38 at ¶ 89; 44 at ¶ 89).

---

[5] An ectopic pregnancy is a pregnancy in which an embryo implants in a location outside the uterus. (Docket # 37-38 at ¶ 90).

**IV.      Pasternack's Report and Testimony**

In opposition to defendants' motion, Overstreet has submitted the report of her retained expert, Joel Pasternack ("Pasternack"), PhD, MD. (Docket # 37-24). Pasternack received his PhD in mathematics from Princeton University and his MD from the University of Rochester. (*Id.* at 7). Pasternack's medical coursework included obstetrics-related education, and he completed a rotation in gynecology and obstetrics at Highland Hospital. (Docket # 37-25 at 16-17).

Pasternack completed his post-doctoral training as a surgical intern and a general surgical resident at Strong Memorial Hospital and Rochester General Hospital and is currently employed in the Department of Emergency Medicine at the University of Rochester. (Docket # 37-24 at 7-8). Pasternack's post-doctoral training involved all areas of general surgery, and he addressed gynecological issues if they presented in a patient who also had a general surgical issue. (*Id.* at 18-19). During his residency, Pasternack, in collaboration with the obstetrics department, evaluated patients suffering from ectopic pregnancies and diagnosed patients with ectopic pregnancies. (*Id.* at 24-25).

After his residency, Pasternack worked in the emergency department at Rochester General Hospital and in other positions. (*Id.* at 27-28). From 1986 through 1993, he worked as a medical doctor, and eventually medical Co-Director, for the Monroe County Jail. (*Id.* at 30-31). In 1993, Pasternack began employment as an attending physician in emergency medicine at Strong Memorial Hospital, where he continues to be employed. (*Id.* at 32-33).

In connection with his responsibilities in the emergency department at Strong, Pasternack has cared for patients with ectopic pregnancies. (*Id.* at 34-35). According to Pasternack, an ectopic pregnancy is diagnosed by considering bHCG levels, ultrasound imaging,

pelvic examination, and patient symptoms, including abdominal pain or tenderness, bleeding, low blood count, low blood pressure or accelerated heart rate. (*Id.* at 47, 50). Pasternack testified that an ectopic pregnancy may sometimes be diagnosed in patients with very low bHCG levels; at other times, the diagnosis cannot be made without additional information. (*Id.* at 41-42, 47-48, 50).

Pasternack testified that ectopic pregnancies are treated with administration of Methotrexate, a medication that terminates the pregnancy, or surgery to remove the products of conception. (*Id.* at 44). According to Pasternack, Methotrexate treatment is not always successful and is less so the further the pregnancy has progressed and the higher the bHCG levels have risen. (*Id.* at 50-51, 53). Pasternack testified that he does not determine the appropriate treatment for a patient with an ectopic pregnancy and thus does not prescribe Methotrexate or surgery for such a patient. (*Id.* at 50-53). Rather, he refers the patient to a physician in the gynecology department to determine the appropriate care. (*Id.*).

In his report in this case, Pasternack opines that a systemic failure in the Jail's policies concerning the Common Form affected Overstreet's medical care. (*Id.* at 5-6). According to Pasternack, a proper "common form system" should permit waiver of the Common Form requirement under certain circumstances to permit inmates to receive medical treatment, including those, like Overstreet, who have serious symptoms and "mental status" issues. (Docket ## 37-24 at 5-6; 37-25 at 77). Pasternack explained that an appropriate jail policy should allow deputies and medical staff to make judgments about inmates who may need medical attention and have not completed a Common Form. (Docket # 37-25 at 72-73). His review of the care provided to Overstreet reveals that the Common Form requirement should have been waived. (*Id.* at 76-77).

Pasternack also opines that the standard of care for a patient experiencing vaginal bleeding early in pregnancy is to evaluate the patient for abnormalities, such as an ectopic pregnancy, a miscarriage with retained products of conception, or other pathologic conditions. (Docket # 37-24 at 5).  In his opinion, Miller's statement that Overstreet was likely suffering from a miscarriage that would pass deviated from the proper standard of care.  (*Id.*).  During his deposition, Pasternack testified that diagnosis without evaluation is inappropriate and that Miller should have informed Overstreet that bleeding during pregnancy warrants evaluation by a medical professional and advised her to see her primary care physician or a gynecologist. (Docket # 37-25 at 80-81).

Pasternack further opines that the Jail's policies prevented Overstreet from receiving timely care during her incarceration and contributed to her delayed care once she was released from the Jail.  (Docket # 37-24 at 6).  According to Pasternack, Miller's advice, rendered without examination, that she was suffering a miscarriage that would pass permitted Overstreet to believe that she was not suffering from a medical problem.  (Docket # 37-25 at 88, 90).  Pasternack testified that he believed that Miller's improper advice that her condition would pass contributed to Overstreet's non-compliance with AOG's recommended treatment.  (*Id.* at 93-97).

Pasternack further opines that a pregnant inmate who is experiencing bleeding and abdominal pain should be evaluated by medical personnel because catastrophic outcomes may occur from undiagnosed ectopic pregnancies.  (Docket # 37-24 at 5).  According to Pasternack, early evaluation of and treatment for ectopic pregnancies reduces mortality and improves functional outcomes.  (*Id.*).  For these reasons, Pasternack opines, failure to evaluate

Overstreet for four days while she experienced bleeding and abdominal pain deviated from the standard of care. (*Id.*).

In addition, Pasternack opines that because Overstreet was in the early stages of pregnancy when she was incarcerated, the ectopic pregnancy would have been identified and would have been amenable to nonsurgical treatment at that time had she been evaluated prior to her release from the Jail. (*Id.*). During his deposition, he clarified that he believes that if the process of evaluating her pregnancy had commenced while she was incarcerated, including obtaining a bHCG level and an ultrasound, Overstreet's ectopic pregnancy would have been diagnosed relatively quickly, likely within one or two days of her release. (Docket # 37-25 at 82-86). Pasternack acknowledges that nonsurgical treatment for ectopic pregnancy is not always appropriate, even during an early stage. (*Id.* at 86-87).

## V.     Dropkin's Opinion

In support of their motion for summary judgment, defendants have submitted an affidavit and a report of their expert, Robert Dropkin ("Dropkin"), MD. (Docket # 37-36 and Ex. A). Dropkin is board-certified in Obstetrics and Gynecology and practices and teaches in the field of obstetrics. (Docket # 37-36 at ¶¶ 2-3). Dropkin opines that an ectopic pregnancy cannot be diagnosed in a woman whose bHCG levels are lower than 2,000-3,000 because an ultrasound at that stage cannot differentiate between ectopic pregnancy and intrauterine pregnancy. (*Id.* at ¶ 9). For that reason, administration of Methotrexate to a patient whose bHCG values are below 2,000-3,000 risks terminating a viable pregnancy. (*Id.* at ¶ 11).

Dropkin further opines that Overstreet's ectopic pregnancy could not have been diagnosed before September 18, 2012, because her bHCG level on September 18 was 1,633. (*Id.*

at ¶ 23). He estimates that September 20, 2012, was the earliest date on which her ectopic pregnancy could have been diagnosed. (*Id.* at ¶ 25). In Dropkin's opinion, the Jail medical staff would not have been able to diagnose her ectopic pregnancy during the period of her incarceration, although it could have been diagnosed earlier and non-surgical intervention could have been possible if Overstreet had obtained a second blood test as instructed by AOG. (*Id.* at ¶¶ 26-28).

## **DISCUSSION**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In reaching this determination, the court must assess whether there are any disputed material facts and, in so doing, must resolve all ambiguities and draw all reasonable inferences against the moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986); *Coach Leatherware Co., Inc. v. AnnTaylor, Inc.*, 933 F.2d 162, 166-67 (2d Cir. 1991). A fact is "material" only if it has some effect on the outcome of the suit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 248; *Konikoff v. Prudential Ins. Co. of Am.*, 234 F.3d 92, 97 (2d Cir. 2000). A dispute regarding a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *see also Konikoff v. Prudential Ins. Co. of Am.*, 234 F.3d at 97.

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact, after which the non-moving party must come forward with sufficient evidence to support a jury verdict in its favor; the motion will not be defeated based upon conjecture, surmise or the existence of "metaphysical doubt" concerning the facts. *Bryant*

*v. Maffucci*, 923 F.2d 979, 982 (2d Cir. 1991) (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).  The party seeking to avoid summary judgment "must do more than make broad factual allegations and invoke the appropriate statute.  The [party] must also show, by affidavits or as otherwise provided in Rule 56 . . . , that there are specific factual issues that can only be resolved at trial."  *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995); *see also Driscoll v. Townsend*, 60 F. Supp. 2d 78, 80 (W.D.N.Y. 1999).

> As the Second Circuit has explained:
>
> [T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them.  Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution . . . .  [I]t must be kept in mind that only by reference to the substantive law can it be determined whether a disputed fact is material to the resolution of the dispute.

*Gallo v. Prudential Residential Serv., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994).


I.      **Fifth, Eighth and Ninth Amendment Claims**

Overstreet's first cause of action asserts a Section 1983 claim against the defendants for deliberate indifference to her medical needs in violation of the Fifth, Eighth, Ninth, and Fourteenth Amendments.  (Docket # 1 at 16).  Defendants seek summary judgment on the claim to the extent it is asserted under the Fifth, Eighth and Ninth Amendments because any deliberate indifference claim that arises from pretrial detention is governed by the Fourteenth Amendment.  (Docket # 37-37 at 26-27).  Overstreet does not oppose this portion of defendants' motion and agrees to withdraw those claims.  (Docket # 45 at 24-25).  Accordingly, this portion of defendants' motion is granted, and Overstreet's Section 1983 cause of action is limited to a Fourteenth Amendment claim.

## II. Claims Against Thompson, John Doe, Santelli, Nurse Lisa and Jane Doe

Defendants seek summary judgment dismissing all claims against defendants John Doe, Jane Doe, Santelli, Nurse Lisa, and Thompson. (Docket # 37-37 at 22-25). Overstreet does not oppose those applications and agrees to withdraw all of her claims against those defendants. (Docket # 45 at 23-25). Accordingly, Overstreet's claims against John Doe, Jane Doe, Santelli, Nurse Lisa, and Thompson are dismissed.

## III. State Law Claims for Negligent Infliction of Emotional Distress, Intentional Infliction of Emotional Distress, Negligence, and Negligent Misrepresentation

Defendants seek summary judgment dismissing all of the state law claims – with the exception of the medical malpractice claim – asserted in the complaint on the grounds that they are barred by the statute of limitations.[6] (Docket ## 1; 37-37 at 57-62; 48 at 11-13). These claims include intentional infliction of emotional distress (Fourth Cause of Action), negligent infliction of emotional distress (Third Cause of Action), negligence (Sixth Cause of Action), and negligent misrepresentation (Seventh Cause of Action). (Docket # 1). Defendants also seek summary judgment dismissing the negligent misrepresentation claim against Virts, Crane, and Miller on the grounds that they did not make any of the alleged misrepresentations. (Docket # 37-37 at 61).

---

[6] In their motion, defendants seek dismissal of the intentional infliction of emotional distress claim against all defendants and the remaining state law claims, with the exception of the malpractice claim, against the County and all of the "official capacity" defendants based upon the statute of limitations. At oral argument on July 24, 2018, defendants' counsel clarified that all of the defendants (except Virts) were seeking dismissal of the state law claims (other than the medical malpractice claim) as untimely because all of the defendants were employed by the County and were acting within the scope of their employment in connection with the alleged tortious conduct. With respect to Virts, counsel conceded that he had not analyzed whether the claims would be time-barred as to the Sheriff, and thus was not seeking to dismiss the claims against Virts on statute of limitations grounds. Accordingly, as indicated during oral argument, the Court does not construe defendants' submission to seek dismissal of the state law claims asserted against Virts as untimely. To the extent that Virts seeks dismissal of the negligence claim on the grounds that Overstreet is unable to demonstrate that defendants' conduct caused the loss of her fallopian tube (Docket # 37-37 at 60-61), I deny that request for the reasons discussed *infra* with respect to Overstreet's malpractice claim against Miller.

Overstreet does not oppose judgment dismissing the negligent misrepresentation claim against Virts, Crane, and Miller. (Docket # 45 at 36). Accordingly, that claim is dismissed as to those defendants. She does, however, oppose defendants' motion insofar as it seeks dismissal of the state law claims as untimely. (*Id.*). According to Overstreet, because she has asserted a Section 1983 claim, all of her other claims are governed by the New York three-year limitations period applicable to personal injury actions. (*Id.*).

Pursuant to New York law, "plaintiffs asserting state tort law claims against a municipal entity or its employees acting in the scope of employment must . . . commence the action within a year and ninety days from the date on which the cause of action accrues." *Parker v. City of New York*, 2008 WL 110904, *12 (S.D.N.Y. 2008) (citing N.Y. Gen. Mun. L. § 50-i); *see also Sanders v. City of New York*, 2015 WL 1469514, *20 (E.D.N.Y.) ("[i]n New York, the statute of limitations for tort actions against [a municipality] or its employees is one year and ninety days") (quotations omitted), *report and recommendation adopted by*, 2015 WL 1469506 (E.D.N.Y. 2015). The statute of limitations set forth in Section 50-i of the New York General Municipal Law applies "to state tort claims brought as pendent claims in a section 1983 action," *Parker v. City of New York*, 2008 WL 110904 at *12 (citing *Warner v. Vill. of Goshen Police Dep't*, 256 F. Supp. 2d 171, 175 (S.D.N.Y. 2003)), including claims for negligence, negligent misrepresentation, intentional infliction of emotional distress, and negligent infliction of emotional distress, *see Cotto v. City of New York*, 2017 WL 3476045, *8 (S.D.N.Y. 2017) (addressing claims for intentional, reckless, or negligent infliction of emotional distress); *Wharton v. Cty. of Nassau*, 2010 WL 3749077, *10 (E.D.N.Y. 2010) (addressing claims for negligence); *Davis Constr. Corp. v. Cty. of Suffolk*, 149 A.D.2d 404, 404 (2d Dep't 1989) (addressing claims for negligent misrepresentation).

No dispute exists that the tortious conduct allegedly committed by the defendants occurred between September 5 and 12, 2012.  This action was commenced on October 13, 2014, more than one year and ninety days later.  (Docket # 1).  Further, there is no apparent dispute that defendants Wilson, DeWind, Miller, and Crane were employees of the County and were acting within the scope of their employment when the alleged tortious conduct occurred.  Accordingly, Overstreet's state law claims for negligence, negligent misrepresentation, intentional infliction of emotional distress, and negligent infliction of emotional distress are dismissed as time-barred as to the remaining defendants (the County, Wilson, DeWind, Miller, and Crane) with the exception of Virts, who, as acknowledged by his counsel at oral argument, has not sought dismissal of these claims on this basis.[7]

## IV.  **Municipal Liability**

The County seeks summary judgment dismissing the Section 1983 claims against it on the grounds that Overstreet has failed to establish that any alleged constitutional violations were caused by its policies, customs, or practices.  (Docket # 37-37 at 30-38).  According to the County, Overstreet has failed to identify any specific Jail policy that caused her injuries or to demonstrate that the County was deliberately indifferent to either the need for a specific policy or further training of its Jail staff.  (*Id.*).

It is well-settled that "'a municipality cannot be made liable' under § 1983 for acts of its employees 'by application of the doctrine of *respondeat superior*.'"  *Roe v. City of Waterbury*, 542 F.3d 31, 36 (2d Cir. 2008) (quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 478 (1986)), *cert. denied*, 558 U.S. 933 (2009).  Rather, "[i]n order to maintain a § 1983 action

---

[7]  As noted above, Overstreet has withdrawn the negligent misrepresentation claim against Virts on other grounds.

against a municipal defendant, a plaintiff must identify a municipal 'policy or custom' from which the alleged injury arose." *Warr v. Liberatore*, 270 F. Supp. 3d 637, 651 (W.D.N.Y. 2017) (citing *Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 694 (1978)).

A plaintiff can establish the "policy or custom" requirement by alleging the existence of:

> (1) a formal policy officially endorsed by the municipality; (2) actions taken by government officials responsible for establishing the municipal policies that caused the particular deprivation in question; (3) a practice so consistent and widespread that, although not expressly authorized, constitutes a custom or usage of which a supervising policy-maker must have been aware; or (4) a failure by policymakers to provide adequate training or supervision to subordinates to such an extent that it amounts to deliberate indifference to the rights of those who come into contact with the municipal employees.

*See id.* at 651-52 (quoting *Perrone v. O'Flynn*, 2015 WL 7776930, *5 (W.D.N.Y. 2015)).

Overstreet opposes the motion, maintaining that the Jail's polices relating to emergency medical care, inmate pregnancy, and supervision of staff were so vague that they failed to provide adequate and necessary guidance to Jail staff. (Docket # 45 at 26-31). During oral argument on the motion, counsel for Overstreet clarified that the claims against the County are limited to the alleged facial invalidity of the policies themselves. She does not argue that there were other instances of similar violations that put the County on notice of the need for additional training of its staff or additional policies. Rather, Overstreet's sole argument is that the policies implemented at the Jail were so obviously deficient that the adoption of such policies amounted to deliberate indifference by the County.[8]

---

[8] Even if Overstreet's argument were interpreted more broadly to assert that the County failed to adequately train corrections staff to recognize urgent medical situations or to recognize when a pregnant inmate might need to be seen by medical personnel, Overstreet has failed to offer any evidence that the County was on

Overstreet contends that the Jail's sick call policy is unconstitutional because it limits inmates' right to receive emergency medical treatment to those instances in which a staff member "has reason to believe any prisoner is in need of immediate medical attention," but provides no guidance to corrections officers to assist them in determining whether any particular medical condition is urgent. (Docket # 45 at 27-28). Overstreet also challenges the policy on the grounds that it does not explicitly state that corrections officers are permitted to dispense with the requirement of a completed Common Form in instances in which they believe immediate medical attention is warranted. (*Id.*).

Overstreet maintains that the Jail's supervision policy, which requires corrections officers to record in the log book "[a]ny unusual event or significant problems occurring during supervision," is likewise constitutionally deficient because it does not provide any guidance to define the types of events or problems that qualify as "unusual" or "significant." (*Id.* at 28-29). For example, in Overstreet's situation, none of the logs document that she complained of bleeding, repeatedly requested sanitary napkins, or refused to complete the Common Form

notice of any inadequacy in its training program. *See Lopez v. City of New York*, 2014 WL 5090041, *3 (S.D.N.Y. 2014) ("[t]o prevail on a section 1983 claim premised on municipal inaction, a plaintiff must show 'that a policymaking official had notice of a potentially serious problem of unconstitutional conduct, such that the need for corrective actions or supervision was obvious, and the policymaker's failure to investigate or rectify the situation evidences deliberate indifference, rather than mere negligence or bureaucratic inaction'") (quoting *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 128 (2d Cir 2004)); *Davis v. Cty. of Nassau*, 355 F. Supp. 2d 668, 678 (E.D.N.Y. 2005) ("a plaintiff alleging that a municipality was deliberately indifferent to the need to train, monitor, or supervise its employees, but not alleging any facts beyond the specific instance giving rise to [her] complaint, generally fails [ ] adequately to plead a custom or policy on the part of the municipality"). Although Overstreet has submitted information relating to another incident, which involved a medical issue with a Jail inmate who died, this other incident occurred the same day that Overstreet was released from the Jail. (Docket # 45 at 20-22). Accordingly, it could not have served to provide the County with notice of any needs relating to the Jail's medical policies or its training of officers implementing those policies. *See Simms v. City of New York*, 480 F. App'x 627, 631 (2d Cir. 2012) (summary order) ("contemporaneous or subsequent conduct cannot establish a pattern of violations that would provide notice to the [municipality] and the opportunity to conform to constitutional dictates") (quoting *Connick v. Thompson*, 563 U.S. 51, 63 n.7 (2011)).

despite being advised by staff to do so.[9]  (*Id.*).  In the absence of guidance, officers are left to

their own discretion to determine what information to record, and the exercise of that discretion

not to record could result in the failure to document "life-threatening" situations, which could be

discovered through review of the log books.  (*Id.*).

Finally, Overstreet challenges as similarly infirm the Jail's policy relating to

pregnant prisoner care because, despite its requirement that pregnant prisoners receive regular

prenatal care, including "safety precautions," no guidance is provided to inform the decisions as

to what safety precautions should be implemented, when they should be implemented, or who

should establish or administer the precautions.  (*Id.*).

In essence, Overstreet's claim is that the County was deliberately indifferent to

the medical needs of pregnant inmates because the Jail's policies described above were so devoid

of practical guidance as to how they should be implemented by corrections officers as to be

obviously inadequate on their face.  Overstreet has cited no legal or factual support for her

challenge.  (Docket ## 45 at 27-31; 48 at 7).  Indeed, Overstreet's own expert, Dr. Pasternack,

who served as the medical director of a county jail for several years, testified that a Common

Form system similar to that used at the Jail is adequate so long as it permits inmates to be treated

by medical personnel in emergency or urgent situations without the need for a completed Form.[10]

(Docket # 37-25 at 73-74).

---

[9]  According to defendants' version of the facts, this information is not included in the relevant logs
because Overstreet did not complain of bleeding to any corrections officers during her incarceration.  (Docket
# 37-37 at 19-20).

[10]  In support of their motion, defendants have submitted affidavits from Crane and Miller, both of whom
maintain that "there have been numerous circumstances in which a Corrections Officer has contacted medical staff
and/or providers directly concerning an issue which [was] believed to necessitate immediate medical attention,
without the use of an Inmate Common Form."  (Docket ## 37-31 at ¶ 27; 37-33 at ¶ 20; 37-38 at ¶ 14).  Overstreet
disputes their assertions on the grounds that they have failed to identify any particular examples.  (Docket # 44 at
¶ 14).

It is well-settled that the mere fact that a municipal policy permits employees to exercise discretion in the performance of their duties does not give rise to municipal liability. *See Cerbelli v. City of New York*, 2008 WL 4449634, *16 (E.D.N.Y. 2008) ("case law has long held that merely giving [municipal employees] discretion in the exercise of their duties does not offend the Constitution") (citing *Pembaur v. City of Cincinnati*, 475 U.S. at 481-82 ("[t]he fact that a particular official . . . has discretion in the exercise of particular functions does not, without more, give rise to municipal liability based on an exercise of that discretion") and *Washburn v. City of New York*, 1993 WL 361601, *2 (S.D.N.Y. 1993) ("[t]he City's grant of discretion to the police . . . does not, without more, support a finding of municipal liability"), *aff'd*, 28 F.3d 103 (2d Cir.), *cert. denied*, 513 U.S. 973 (1994)). Further, "it would be impossible for the [County] to speculate as to all possible" medical events, conditions or symptoms that inmates, pregnant or otherwise, might experience in jail or to provide adequate guidance for every conceivable medical situation that corrections officers might confront.[11] *See Miron v. Town of Stratford*, 881 F. Supp. 2d 280, 286 (D. Conn. 2012). Indeed, despite Overstreet's contention that the policies should have provided additional guidance in order to conform to constitutional requirements, she herself has not identified with any specificity the particular guidance that should have been included. (Docket # 45 at 27-31).

I find that Overstreet's conclusory assertion that the Jail's policies were inadequate to ensure that proper medical care was provided to pregnant inmates at the Jail "fails to allege the level of culpability requisite to pursue a claim of municipal liability." *See Olschafskie v. Town of Enfield*, 2017 WL 4286374, *14 n.12 (D. Conn. 2017) ("the failure to

---

[11] Indeed, policies that provide specific guidelines present their own risks, namely, that their specificity may lead officers to believe they lack the discretion to provide emergency medical treatment to inmates in scenarios other than those specifically outlined in the policy.

adopt optimal practices does not equal deliberate indifference, at least in the absence of evidence that the failure to be proactive is leading to the violation of constitutional rights"); *Miron v. Town of Stratford*, 881 F. Supp. 2d at 286 (dismissing municipal liability claim where "[p]laintiff has failed to identify specific deficiencies in either of the two policies currently in place, and merely argues generally that the constitutional violations he purports to have suffered . . . could have been avoided had more specific policies been enacted"); *Cerbelli v. City of New York*, 2008 WL 4449634 at *16 (granting summary judgment on municipal liability claim; "[p]laintiff sets forth only vague, conclusory arguments to contest the [police policy][,] [and] asserts without legal or factual support that stripping officers of [discretion] . . . would improve police training and prevent constitutional violations[;] [t]his argument does not raise a triable issue of fact"). Accordingly, I grant the County's motion for summary judgment dismissing Overstreet's Section 1983 claims against it.

## V.  **Claim for Deliberate Indifference to Medical Care**

Defendants maintain that they are entitled to summary judgment dismissing Overstreet's Section 1983 claim for deliberate indifference to her medical needs.[12]  First, they maintain that Overstreet cannot establish the personal involvement of either Virts or Crane, entitling them to dismissal of the claim.  (Docket ## 37-37 at 39-41; 48 at 8-9).  With respect to the claims against DeWind, Wilson and Miller, defendants maintain that Overstreet's condition was not sufficiently serious to sustain the claim because no evidence exists that any alleged deprivation or denial of care by defendants caused her injuries.  (Docket ## 37-37 at 42-44; 48 at 9).  Defendants further argue that, in any event, they were not deliberately indifferent to

---

[12]  As a result of the determinations made *supra*, the defendants against whom Overstreet asserts the Section 1983 claim are Virts, Crane, DeWind, Wilson, and Miller.

Overstreet's medical needs because the medical records unequivocally demonstrate that Miller met with Overstreet on multiple occasions during her incarceration. (Docket ## 37-37 at 27-30; 48 at 4-6). Finally, they maintain that the record establishes that DeWind and Wilson were not reckless in instructing Overstreet to complete a Common Form in order to see a medical provider, and that Miller was not reckless in informing Overstreet, who had told Miller that she intended to see a doctor after her release, that she was likely having a miscarriage. (Docket ## 37-37 at 44-45; 45 at 9).

Overstreet counters that issues of material fact preclude summary resolution of her deliberate indifference claim. (Docket # 45 at 25-26, 32-33). According to Overstreet, Virts and Crane were personally involved in the deprivation of medical care because they created the policies that permitted the unconstitutional practices that injured Overstreet. (*Id.* at 31-32). With respect to DeWind, Wilson, and Miller, Overstreet contends that her condition was sufficiently serious, as acknowledged by the Jail's physician assistant who testified that he would have instructed Overstreet to go immediately to the emergency room upon her release if he had known of her condition. (*Id.* at 32). Overstreet disputes the accuracy of the medical records and contends that such dispute forecloses judgment as a matter of law. (*Id.* at 25-26). Finally, she maintains that DeWind and Wilson acted indifferently by not obtaining medical assistance for her during her incarceration and that Miller acted indifferently when she advised Overstreet that she was having a miscarriage. (*Id.* at 33).

A.    **Personal Involvement of Virts and Crane**

Virts and Crane maintain that they are entitled to summary judgment dismissing the Section 1983 deliberate indifference claim against them because Overstreet has failed to establish that they were personally involved in the alleged constitutional violation. (Docket

# 37-37 at 39-41). Overstreet opposes the motion on the grounds that Virts and Crane, although not directly involved in the alleged constitutional violation, were responsible as supervisors for formulating, adopting, and reviewing the Jail's policies relating to the medical care provided to inmates and are thus liable. (Docket # 45 at 31-32).

"Supervisory liability is a concept distinct from municipal liability, and is imposed against a supervisory official in his individual capacity for his own culpable action or inaction in the training, supervision or control of his subordinates." *Rogoz v. City of Hartford*, 2012 WL 4372189, *8 (D. Conn. 2012) (quotations omitted). "It is well settled in this Circuit that 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.'" *Sash v. United States*, 674 F. Supp. 2d 531, 542 (S.D.N.Y. 2009) (quoting *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994)). Thus, "[i]t is not enough to show that a defendant ultimately supervised those who allegedly violated plaintiff's [c]onstitutional rights." *Id.* (quotation omitted).

Instead, "to sustain a section 1983 claim against a supervisory official in his individual capacity, the plaintiff must allege and demonstrate that the official was personally involved in the alleged constitutional violation." *Pierce v. Ottoway*, 2009 WL 749862, *5 (W.D.N.Y. 2009) (citing *Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003)). According to the Second Circuit, a supervisory defendant may be shown to have been personally involved in a constitutional violation through evidence that:

> (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuation of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of [the

> plaintiff] by failing to act on information indicating that
> unconstitutional acts were occurring.

*Colon v. Coughlin*, 58 F.3d at 873.[13]

Overstreet seeks to hold Crane and Virts liable under the third theory outlined in *Colon*. (Docket # 45 at 31-32). She has not, however, alleged any facts establishing knowledge by or notice to Virts or Crane about other medical incidents implicating the policies. As explained *supra*, I have concluded that Overstreet has not raised a triable issue of fact as to her claim that the Jail's policies were so obviously inadequate that the County's failure to remedy can be said to amount to deliberate indifference. In the absence of any more particularized allegations against Virts and Crane, I find that the Section 1983 claims against them should be dismissed for the same reason.

### B.   Claims Against DeWind, Wilson, and Miller

As discussed above, and as conceded by the parties, Overstreet's claims are based upon events that occurred while she was incarcerated as a pretrial detainee and thus implicate the Fourteenth, rather than the Eighth, Amendment. *See Darnell v. Pineiro*, 849 F.3d 17, 29 (2d Cir. 2017). A plaintiff stating a claim for deliberate indifference must satisfy two elements. *See id.*; *Feliciano v. Anderson*, 2017 WL 1189747, *8 (S.D.N.Y. 2017) ("[r]egardless of whether a deliberate indifference claim is brought by a convicted prisoner under the Eighth Amendment or by a pretrial detainee under the Fourteenth Amendment, the plaintiff must satisfy a two-prong

---

[13] "Courts in this Circuit are 'divided as to whether the five categories announced in *Colon* may still be used as the bases for liability under § 1983' following the Supreme Court's decision in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009)." *Holmes v. Capra*, 2018 WL 3117511, *3 (S.D.N.Y. 2018) (quoting *Allah v. Annucci*, 2017 WL 3972517, *6 (S.D.N.Y. 2017)). However, "[t]he Second Circuit has not squarely address how *Iqbal* . . . affects the standards in *Colon* for establishing liability." *Holmes v. Capra*, 2018 WL 3117511 at *3 n.4. In the absence of authority mandating otherwise, the Court will continue to apply and analyze the five theories of liability announced in *Colon*. *See, e.g.*, *Johnson v. Fischer*, 2011 WL 6739520, *2 n.1 (N.D.N.Y. 2011) ("the court, until instructed to the contrary, continues to apply the five factor *Colon* test"). In any event, courts in this Circuit generally agree that the creation of a policy or custom remains a viable theory of supervisory liability even post-*Iqbal*. *See Drew v. City of New York*, 2016 WL 4533660, *11 & n.17 (S.D.N.Y. 2016) (collecting cases).

test").  First, the plaintiff must allege that she suffered from a sufficiently serious medical condition.  *Feliciano v. Anderson*, 2017 WL 1189747 at *8.  Second, the plaintiff must allege that the defendant was deliberately indifferent to her medical condition.  *Id.*; *Bruno v. City of Schenectady*, 727 F. App'x 717, 720 (2d Cir.) (summary order) ("plaintiff must plead facts 'show[ing] that [she] had a serious medical condition and that it was met with deliberate indifference'") (quoting *Cuoco v. Moritsugu*, 222 F.3d 99, 106 (2d Cir. 2000)), *cert. denied*, 139 S. Ct. 259 (2018).

### 1.  <u>Serious Medical Condition</u>

With respect to the first element, the legal standard is the same under the Fourteenth Amendment as under the Eighth Amendment.  *See Cuffee v. City of New York*, 2017 WL 1134768, *5 (S.D.N.Y. 2017) ("[w]ith respect to the objective component, the legal standard is the same under both the Eighth and the Fourteenth Amendments").  "A medical need is 'serious' for constitutional purposes if it presents 'a condition of urgency' that may result in 'degeneration' or 'extreme pain.'"  *Sowell v. Chappius*, 695 F. Supp. 2d 16, 20 (W.D.N.Y. 2010) (quoting *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998)).  This inquiry is highly fact-specific, and factors to consider include "(1) whether a reasonable doctor or patient would perceive the medical need in question as 'important and worthy of comment or treatment'; (2) whether the medical condition significantly affects daily activities; and (3) the existence of chronic and substantial pain."  *Brock v. Wright*, 315 F.3d 158, 162 (2d Cir. 2003).

Defendants challenge Overstreet's ability to satisfy this showing on two grounds.  First, they maintain that Overstreet cannot establish that any deprivation or delay of medical treatment caused the loss of her fallopian tube.  (Docket # 37-37 at 42-43, 50-57).  Causation

aside, they also contend that Overstreet cannot demonstrate that she was in need of immediate medical attention, thus undermining the alleged seriousness of her condition. (*Id.* at 44).

Defendants' causation argument misconstrues the nature of a Section 1983 deliberate indifference claim, as well as the nature of Overstreet's claimed injuries. Defendants essentially argue that Overstreet cannot prove that their failure to provide treatment during her period of incarceration caused the loss of her fallopian tube. To advance this argument, they rely upon Dropkin's opinion that an ectopic pregnancy could not have been diagnosed during the stage of her pregnancy when Overstreet was in Jail, and, even if it could have been, the efficacy of nonsurgical treatment would have been uncertain. Defendants challenge Pasternack's contrary opinion – that Overstreet's ectopic pregnancy would have been diagnosed during or shortly after her incarceration had she received proper treatment – as inadmissible under Rule 702 of the Federal Rules of Civil Procedure.

Even assuming that Overstreet lacks admissible expert testimony regarding causation,[14] claims for deliberate indifference do not require expert testimony to establish the seriousness of a medical need. *See Griffith v. Hofmann*, 2008 WL 4682690, *8 (D. Vt. 2008) (citing *Olivier v. Robert L. Yeager Mental Health Ctr.*, 398 F.3d 183, 191 n.7 (2d Cir. 2005); *Hathaway v. Coughlin*, 37 F.3d 63, 68 (2d Cir. 1994)). Rather, "[a] plaintiff can meet the objective component of the deliberate indifference standard without the assistance of an expert by showing that the defendants were themselves aware that a delay [or deprivation] in treatment posed a serious medical problem." *McAfee v. Naqvi*, 2017 WL 3184171, *6 (D. Conn. 2017); *see also Hathaway v. Coughlin*, 37 F.3d at 68 ("[w]e have never required plaintiffs alleging a denial of adequate medical care in a Section 1983 action to produce medical testimony[;] [t]he

---

[14] The challenge is addressed *infra*.

inquiry remains whether the treating physician or other prison official was deliberately indifferent to a prisoner's serious medical needs, not whether the doctor's conduct is actionable under state malpractice law").

Defendants' argument is based on the faulty premise that Overstreet's only claimed injury is the loss of her fallopian tube. Overstreet's discovery responses, however, reveal that she seeks damages not only for the loss of her fallopian tube, but also for pain and suffering, including the emotional distress she endured as a result of defendants' conduct. (Docket # 37-26 at 18 ("[Overstreet] claims damages for the violation of her constitutional rights, the emotional harm she suffered in the Jail between 9/8/12 and 9/12/12 from fear of believing she needed medical attention but not receiving adequate medical attention; the pain and suffering associated with the intense abdominal pain")). Overstreet's allegations that defendants' conduct of denying her medical care when she was pregnant, bleeding, and suffering from abdominal pain caused her pain and suffering, including emotional distress, fall within the "sphere of the common knowledge of the lay person" and may "sustain a claim of deliberate indifference, even without expert testimony."[15] *McAfee*, 2017 WL 3184171 at *7-8.

I also reject defendants' contention that Overstreet's medical condition was not sufficiently serious to proceed to trial on her Section 1983 claim. Drawing all reasonable inferences in Overstreet's favor, I easily find that defendants have not demonstrated that they are entitled to judgment as a matter of law on the grounds that her condition was not sufficiently serious. She has alleged that she began bleeding on September 8, 2012, and despite repeated requests for medical attention and sanitary napkins, was not provided any medical care during

---

[15] Whether Overstreet's ectopic pregnancy could have been diagnosed sooner, and whether her fallopian tube could have been saved, are questions "outside the realm of expertise of a lay member of the jury" that presumably will require medical expert testimony to address. *See McAfee v. Naqvi*, 2017 WL 3184171 at *8.

her period of incarceration notwithstanding her positive pregnancy test.  Although DeWind and Wilson directed her to fill out a Common Form, they allegedly discouraged her use of the form by telling her that she would not receive medical attention for a week even if she completed the form.

On this record and construing the disputed facts in the light most favorable to Overstreet, I conclude that Overstreet's allegations are adequate to defeat defendants' challenge. *See*, *e.g.*, *Townsend v. Jefferson Cty.*, 601 F.3d 1152, 1158 (11th Cir. 2010) (incarcerated pregnant plaintiff experiencing abdominal pain and vaginal bleeding "presented evidence that she had a serious medical need"); *Goebert v. Lee Cty.*, 510 F.3d 1312, 1326 (11th Cir. 2007) (amniotic fluid leak was a serious medical need); *Pool v. Sebastian Cty.*, 418 F.3d 934, 944-45 (8th Cir. 2005) (plaintiff "informed prison officials that she was pregnant, bleeding and passing blood clots . . . [and] that [she] was in extreme pain from the cramping[;] . . . [t]hese facts . . . constituted a need for medical attention that would have been obvious to a layperson") (internal quotation omitted); *Cooper v. Rogers*, 968 F. Supp. 2d 1121, 1131 (M.D.  Ala. 2013) ("[p]rolonged vaginal bleeding, particularly when accompanied by pain, is a serious medical condition that is indeed so obvious that even a lay person would easily recognize[] the necessity for a doctor's attention") (internal quotations omitted); *Cooper v. Rogers*, 2012 WL 2050577, *4 (M.D. Ala. 2012) ("the law is unwaveringly clear that prolonged vaginal bleeding during pregnancy does constitute a serious medical need") (collecting cases); *Ferris v. Cty. of Kennebec*, 44 F. Supp. 2d 62, 67 (D. Me. 1999) (plaintiff's allegations that she informed prison officials that she was experiencing vaginal bleeding and believed she was miscarrying "was plainly serious"); *see also Archer v. Dutcher*, 733 F.2d 14, 16 (2d Cir. 1984) (pregnant inmate's allegations of delay in medical care were sufficient to raise triable issue of fact as to deliberate

indifference claim).  Accordingly, on the record before this Court, defendants have failed to establish as a matter of law that Overstreet did not suffer from a serious medical condition.

### 2.    **Defendants' Culpability**

Turning to the second element, the applicable legal standard differs depending upon whether the plaintiff is a pretrial detainee or a convicted prisoner.  *See Darnell v. Pineiro*, 849 F.3d at 35.  Pretrial detainees, whose claims are governed by the Fourteenth Amendment, must establish that the defendant acted with objective recklessness; convicted prisoners, by contrast, must allege that the defendant acted with subjective awareness of the risk of harm.  *See id.*; *Bruno v. City of Schenectady*, 727 F. App'x at 720 (applying objective standard to second prong of deliberate indifference claim asserted by pretrial detainee); *Davis v. McCready*, 283 F. Supp. 3d 108, 117 (S.D.N.Y. 2017) ("the *mens rea* prong of a deliberate indifference claim brought by a pretrial detainee is now to be assessed objectively").

Overstreet must allege sufficient facts to establish a triable issue of fact whether defendants "acted *intentionally* to impose the alleged condition, *or recklessly* failed to act with reasonable care to mitigate the risk that the condition posed to [Overstreet] even though [defendants] *knew, or should have known*, that the condition posed an excessive risk to health or safety."  *Bruno*, 727 F. App'x at 720 (quoting *Darnell*, 849 F.3d at 35); *Feliciano*, 2017 WL 1189747 at *13 (for claims involving "deliberate indifference to serious medical needs, the [c]ourt concludes that a defendant possesses the requisite *mens rea* when he acts or fails to act under circumstances in which he knew, or should have known, that a substantial risk of serious harm to the pretrial detainee would result").  Of course, it is "well-established that negligence, even if it amounts to medical malpractice, does not constitute a constitutional violation." *Villafane v. Sposato*, 2017 WL 4179855, *23 (E.D.N.Y. 2017) (internal quotation omitted);

*Feliciano*, 2017 WL 1189747 at *13 ("the defendants' actions must be more than merely negligent") (internal quotations and brackets omitted).

Defendants maintain that they are entitled to judgment on this prong because indisputable evidence establishes that Overstreet met with Miller at least twice after her bleeding allegedly started and thus was not denied medical care. (Docket ## 37-37 at 27-30; 48 at 4-6). According to defendants, Overstreet's self-serving testimony to the contrary is insufficient to create an issue of fact where, as here, the Jail records (the TB Test Sheet and the MARS log) demonstrate that Miller provided medical care to Overstreet after her bleeding commenced.

Defendants are correct that courts are generally reluctant to permit a party's self-serving and otherwise unsupported assertions to create an issue of fact where they are blatantly contradicted by documentary evidence. *See*, *e.g.*, *Scott v. Harris*, 550 U.S. 372, 380 (2007) ("[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment"); *Vega v. Rell*, 611 F. App'x 22, 25 (2d Cir. 2015) (summary order) (district court properly concluded that plaintiff's counter-assertions of fact were undercut by his uncontroverted medical records); *Acevedo v. Wilson*, 2017 WL 6624019, *3 (D. Conn. 2017) ("[h]ere, the medical record shows that plaintiff received the medication and treatment he was prescribed[;] [t]hus, any claim that [the facility nurse] destroyed his prescriptions, delayed his surgery, or denied him glasses, artificial tears, or other medication, is contradicted by the record"); *Cabassa v. Ostheimer*, 2017 WL 2785334, *3 (D. Conn. 2017) ("[h]ere, the medical record shows that plaintiff received pain medication and treatment for his injury[;] [t]hus, any claim that he was provided no pain medication is contradicted by the record"); *Cipriani v. Schenectady Cty.*, 2009 WL 3111681, *17 (N.D.N.Y.

2009) ("[plaintiff's] assertions stand alone in contradiction to all other evidence, particularly as to the seriousness of his condition[;] [a] party may not create an issue of fact simply by an unsupported statement, particularly where it concerns a medical issue refuted by the medical evidence"). Having reviewed the relevant documents and testimony before the Court in this case, however, I find that Overstreet's allegation that she did not meet with Miller after September 7 until she saw her on September 12 after her return from court is not so "blatantly contradicted" by the TB Test Sheet and the MARS log to justify crediting defendants' version over Overstreet's. *See Zachary v. City of Newburgh*, 2016 WL 4030925, *10 (S.D.N.Y. 2016) ("[a]lthough plaintiff's medical records do appear incongruous with his version of events, plaintiff's account is not so 'blatantly contradicted' by the video and documentary evidence such that the [c]ourt should discredit plaintiff's account at this stage as a matter of law"). The records defendants rely upon here are not detailed treatment notes or video recordings, but consist of one TB test record and initials on a MARS log. *Cf. Scott v. Harris*, 550 U.S. at 380 (video recording); *Vega v. Rell*, 611 F. App'x at 25 (uncontroverted medical records); *Acevedo v. Wilson*, 2017 WL 6624019 at *3 (prescription and treatment notes); *Cabassa v. Ostheimer*, 2017 WL 2785334 at *2 (treatment notes); *Cipriani v. Schenectady Cty.*, 2009 WL 3111681 at *17 (treatment notes). Not only are these documents susceptible to inadvertent errors – indeed, the handwritten date and results are transposed on the TB Test Sheet – but Overstreet has submitted evidence to question the reliability of Miller's record-keeping. That evidence includes records demonstrating that Miller was disciplined for failing to properly document inmate care information on or about the very day that her initials appear on Overstreet's MARS log. *Cf. Scott*, 550 U.S. at 378 ("[t]here are no allegations or indications that this videotape was doctored or altered in any way, nor any contention that what it depicts differs from what actually

happened"); *Vega*, 611 F. App'x at 26 ("[o]n appeal, [plaintiff] does not claim that the district court misconstrued the medical records, nor does he point to any evidence that refutes the defendant's statement of facts").  Under such circumstances, a reasonable jury could conceivably credit Overstreet's version of events, despite the TB Test Sheet and MARS log.  Accordingly, I decline to discredit as a matter of law Overstreet's version of the facts in favor of defendants. *See Telesford v. Tamer*, 2016 WL 5338083, *4 (N.D.N.Y. 2016) ("the contemporaneous photographs and medical records cited by [d]efendants (revealing no physical injuries) would not render impossible a finding by a rational fact-finder of the existence of at least some injury"); *Zachary v. City of Newburgh*, 2016 WL 4030925 at *10 ("[t]o the extent defendants invite the [c]ourt to discredit plaintiff's version of events based on the minor injuries reflected in his medical records, the [c]ourt declines to do so").

Defendants also maintain that they are entitled to judgment on the second element because, even accepting Overstreet's version of events as true, their actions were not objectively reckless under the circumstances.  (Docket # 37-37 at 44-46).  According to defendants, Miller's statement that Overstreet was likely having a miscarriage that would "pass" was not objectively reckless, particularly because Overstreet had informed Miller that she planned to see a doctor upon her release.  (*Id.*).  With respect to DeWind and Wilson, they maintain that their conduct was not objectively reckless because the record does not indicate that Overstreet's condition required emergency medical attention.  (*Id.*).  They argue that Overstreet's own failure to complete the Common Form as instructed is itself evidence that her condition was not urgent. (*Id.*).

Taking Overstreet's allegations as true, DeWind and Wilson were aware that she was pregnant and bleeding and repeatedly requested medical assistance.  Rather than confer with

their supervisor or the Jail's medical staff, they told Overstreet to fill out a form that would take a week to be processed before she would be seen, a delay that Overstreet expected would exceed her period of incarceration. These facts are sufficient to raise a triable issue of fact that DeWind and Wilson recklessly failed to obtain medical treatment because they knew or should have known that Overstreet's condition posed an excessive risk to her health or safety. *See Goebert v. Lee Cty.*, 510 F.3d at 1327-28 (defendant's failure to respond to pregnant plaintiff's complaints that she was "leaking fluid for nine days, that the jail doctor recognized the need for her to see an outside doctor, that the problem had become worse since she was seen by the jail doctor, and that she had not felt the baby move for a few days . . . "smack[ed] of deliberate indifference"); *Pool v. Sebastian Cty.*, 418 F.3d at 944-45 (prison officials were aware that plaintiff was "pregnant, bleeding and passing blood clots"; "we cannot say that as a matter of law [prison officials] were not deliberately indifferent in responding to [plaintiff's] miscarriage"); *Boswell v. Sherburne Cty.*, 849 F.2d 1117, 1122 (8th Cir. 1988) (affirming district court's denial of qualified immunity to defendant who "learned that [plaintiff was bleeding and generally was having a difficult pregnancy[,] . . . [but] did not contact [plaintiff's] physician or other trained medical personnel, and failed to inform the next shift of [plaintiff's] bleeding[;] [t]hese facts create a jury question as to whether a reasonable jailer in [defendant's] position would have known that the failure even to inquire of trained medical personnel, or to alert the next shift that [plaintiff] was in danger of having a miscarriage, violated [plaintiff's] clearly established right to medical care"), *cert. denied*, 488 U.S. 1010 (1989); *Cooper v. Rogers*, 968 F. Supp. 2d at 1132 ("not only were [d]efendants aware of her pregnancy . . . , but they were also aware of the vaginal bleeding and pain she was experiencing during her pregnancy[;] . . . [d]efendants disregarded th[e] risk of harm by ignoring [p]laintiff's requests for medical attention or responding to them with threats");

*Cooper v. Rogers*, 2012 WL 2050577 at *6 ("[d]efendants are alleged to have known of [p]laintiff's condition [of being pregnant and bleeding] for thirteen days, to have shown contempt for it and for her, and to have only relented when an assuredly upset probation officer confronted them[;] [t]he phrase 'deliberate indifference' could have been coined in the context of these allegations"). The fact that Overstreet did not complete the Common Form, especially where she was informed that it would not result in her receiving medical attention before her expected release, does not alter this conclusion. *See Cooper*, 968 F. Supp. 2d at 1131 ("[p]laintiff's failure to be overly specific or to use detailed nomenclature in requesting to see a doctor does not lessen the seriousness of her medical condition").

I reach a similar conclusion with respect to Miller. The record demonstrates that Fletcher, the Jail's physician assistant, testified that had he known that Overstreet had been experiencing vaginal bleeding for several days, he would have advised her to go directly to the emergency department for evaluation upon her release. (Docket # 44 at 11, ¶ 23 (citing Docket # 42 at Ex. I at 42)). Irrespective of whether Miller believed that Overstreet planned to obtain a medical evaluation upon her release, a reasonable jury could conclude that it was objectively reckless for Miller to inform Overstreet that she was likely experiencing a miscarriage that would pass naturally, but not inform her of the risks to herself posed by her condition. *See Ferris v. Cty. of Kennebec*, 44 F. Supp. 2d at 67 (defendant's failure to assess or treat pregnant and bleeding plaintiff beyond taking her pulse and telling her to lie down "reasonably could be viewed as sufficiently inadequate to constitute deliberate indifference"). In making such a determination, a jury may also credit and consider Overstreet's allegation that Miller had not examined or evaluated her since administering the TB test on September 7. On this record, I find

that defendants DeWind, Wilson, and Miller have failed to establish their entitlement to judgment as a matter of law on Overstreet's deliberate indifference claim.

## VI.     <u>State Law Malpractice Claim</u>

I turn finally to defendants' motion for summary judgment dismissing the malpractice cause of action in its entirety, which remains pending only against Miller and Crane. Crane seeks summary judgment dismissing the claim on the grounds that Overstreet has failed to allege that he committed any acts of malpractice or that he is vicariously liable for any acts attributed to the other defendants. (Docket # 37-37 at 47). Miller maintains that she is entitled to summary judgment dismissing this claim on the grounds that her alleged statements to Overstreet on September 12 do not amount to medical care and, even if they do, Overstreet is unable to establish that the "care" Miller provided proximately caused her injuries. (*Id.* at 49-57). Miller contends that Pasternack's report should be precluded or at least those portions reflecting his opinions on causation should be excluded. (*Id.* at 52-57).

Overstreet urges that issues of fact exist as to whether Miller provided medical advice to Overstreet and whether Overstreet relied upon that advice, which preclude summary resolution of this claim against Miller. (Docket # 45 at 34-35). With respect to causation, Overstreet maintains that Pasternack's expert opinion and testimony create issues of fact as to whether Miller's advice, including her failure to inform Overstreet of the seriousness of her condition, caused Overstreet's injuries. (*Id.*).

"To prevail on a medical malpractice claim in New York, a plaintiff must demonstrate '(1) that the defendant breached the standard of care in the community, and (2) that the breach proximately caused plaintiff's injuries.'" *Foley v. United States*, 294 F. Supp. 3d 83,

96-95 (W.D.N.Y. 2018) (quoting *Arkin v. Gittleson*, 32 F.3d 658, 664 (2d Cir. 1994)).  Each of these elements "must be established by expert testimony, unless the testimony is within the ordinary knowledge and experience of the jury."  *Vale v. United States*, 673 F. App'x 114, 116 (2d Cir. 2016) (summary order); *see Smith v. Masterson*, 353 F. App'x 505, 507-08 (2d Cir. 2009) (summary order) ("[t]o establish a *prima facie* case of medical malpractice under New York law, a plaintiff must adduce expert opinion of a deviation from accepted standards of medical care proximately causing injury").  "The medical malpractice case in which no expert testimony is required is rare."  *Foley v. United States*, 294 F. Supp. 3d at 96 (internal quotations omitted).

### A.    Claim against Crane

As noted above, Crane seeks summary judgment dismissing the malpractice claim against him on the grounds that Overstreet has failed to allege that he committed any acts of malpractice or that he is vicariously liable for any acts attributed to the other defendants. (Docket # 37-37 at 47).  Overstreet does not oppose this aspect of the motion and has agreed to withdraw the malpractice claim asserted against Crane.  (Docket # 45 at 34).  Accordingly, this portion of defendants' motion to dismiss is granted, and the malpractice claim against Crane is dismissed.

### B.    Admissibility of Pasternack's Report

Miller challenges the admissibility of Pasternack's report on the grounds that he is not qualified to offer any opinion testimony on the diagnosis and treatment of ectopic pregnancy. (Docket # 37-37 at 52-53).  In Miller's view, Pasternack is an emergency physician, who routinely consults with colleagues in the hospital's obstetrics and gynecology department when he treats a patient in the emergency department whom he believes to have an ectopic pregnancy.

(*Id.*).  Because he does not ultimately determine the treatment to be provided to such patients –
for example, whether to administer Methotrexate or perform surgery – Miller argues that
Pasternack is not qualified to offer opinion testimony concerning the diagnosis or treatment of
this condition.  (*Id.*).

Even if Pasternack were qualified, Miller continues, his causation opinion is too
conclusory to be admissible at trial.  (*Id.* at 53-57).  According to Miller, Pasternack's report fails
to explain an ectopic pregnancy and how it is diagnosed, and fails to provide any basis for his
opinion that Overstreet's ectopic pregnancy could have been diagnosed at a time to permit
non-surgical treatment had she been evaluated while in Jail.  (*Id.*).  Nor does Pasternack's
deposition testimony cure the deficiencies in his report, even if it could be considered for that
purpose.  (*Id.*).

Miller further challenges Pasternack's report on the grounds that it is not based
upon sufficient facts or data because he neither referenced, nor apparently reviewed, the medical
records from AOG, where Overstreet sought treatment shortly after her release.  (*Id.*).  According
to Miller, Pasternack's report reveals that he misunderstood Overstreet's post-release treatment
and was not aware of the treatment recommendations she received from AOG after her release.
(*Id.*).  Finally, she notes that Pasternack's report and deposition testimony suggest without
support that Overstreet suffers from a cognitive deficit or abnormal mental status.  (*Id.*).
Overstreet did not respond directly to defendants' challenge to the admissibility of Pasternack's
report.  (Docket # 45).

Rule 702 of the Federal Rules of Evidence requires that a proposed expert witness
be qualified on the basis of "scientific, technical, or other specialized knowledge [that] will help
the trier of fact to understand the evidence or to determine a fact in issue."  Fed. R. Evid. 702.

Accordingly, an expert may provide testimony if (1) "the testimony is based upon sufficient facts or data"; (2) "the testimony is the product of reliable principles and methods"; and, (3) "the expert has reliably applied the principles and methods to the facts of the case." *Id.* The trial court must fulfill a "gatekeeping" duty under Rule 702 to ensure that any expert testimony to be admitted is "not only relevant, but reliable." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993); *see also Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999). Thus, the trial court's inquiries should focus on three issues: "(1) whether the witness is qualified to be an expert; (2) whether the opinion is based upon reliable data and methodology; and (3) whether the expert's testimony on a particular issue will assist the trier of fact." *Arista Records LLC v. Lime Grp. LLC*, 2011 WL 1674796, *1 (S.D.N.Y. 2011) (citing *Nimely v. City of New York*, 414 F.3d 381, 396-97 (2d Cir. 2005)).

Under *Daubert* and *Kumho Tire*, a court must "first determine whether the proffered testimony is relevant." *Am. Ref-Fuel Co. of Niagara, LP v. Gensimore Trucking, Inc.*, 2008 WL 1995120, *3 (W.D.N.Y. 2008). Further, the testimony must "help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702; *see also Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. at 591; *Campbell v. Metro. Prop. & Cas. Ins. Co.*, 239 F.3d 179, 184 (2d Cir. 2001). The question is one of "fit," meaning that the evidence must be "sufficiently tied to the facts of the case." *Daubert*, 509 U.S. at 591 (quoting *United States v. Downing*, 753 F.2d 1224, 1242 (3d Cir. 1985)). After determining that the proffered testimony is relevant, the court must determine whether the proffered testimony "has a sufficiently 'reliable foundation' to permit it to be considered." *Am. Ref-Fuel Co. of Niagara, LP v. Gensimore Trucking, Inc.*, 2008 WL 1995120 at *3 (quoting *Campbell v. Metro. Prop. & Cas. Ins. Co.*, 239

F.3d at 184-85). The court has "considerable leeway" in deciding how best to make that determination. *Kumho Tire Co. v. Carmichael*, 526 U.S. at 152.

In determining reliability, the trial court must "focus on the principles and methodology employed by the expert, without regard to the conclusions the expert has reached or the [court's] belief as to the correctness of those conclusions." *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 267 (2d Cir. 2002). To assist courts in making this determination, the Supreme Court has identified the following factors to consider when determining the reliability of the methodology used by a proffered expert: "(1) whether the theory or technique can be tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) whether the technique has a known or potential rate of error; and (4) whether the theory or technique has been met with widespread acceptance." *Emig v. Electrolux Home Prods. Inc.*, 2008 WL 4200988, *6 (S.D.N.Y. 2008) (citing *Daubert*, 509 U.S. at 593-94). The Rule 702 inquiry is "a flexible one," *Daubert*, 509 U.S. at 594, and while "a trial court *may* consider one or more of the more specific factors that *Daubert* mentioned[,] . . . [the] list of specific factors neither necessarily nor exclusively applies to all experts or in every case," *Kumho Tire Co.*, 526 U.S. at 141. "The primary objective is 'to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practices of an expert in the relevant field.'" *Cerbelli v. City of New York*, 2006 WL 2792755, *2 (E.D.N.Y. 2006) (quoting *Kumho Tire Co.*, 526 U.S. at 152).

Miller challenges Pasternack's report on the grounds that Pasternack is an emergency medicine physician who does not specialize in gynecology and obstetrics and does not routinely diagnose or treat individuals with ectopic pregnancies. (Docket # 37-37 at 52-53).

Of course, "lack of specialization is not a *per se* bar to qualification as an expert"; so long as "an expert has educational and experiential qualifications in a general field closely related to the subject matter in question, the court will not exclude the testimony solely on the ground that the witness lacks expertise in the specialized areas that are directly pertinent." *Tardif v. City of New York*, 344 F. Supp. 3d 579, 598 (S.D.N.Y. 2018) (quoting *Arista Records LLC v. Lime Grp. LLC*, 2011 WL 1674796 at *3).

Pasternack has a medical degree that required him to complete obstetrics-related coursework and a rotation in gynecology and obstetrics. Additionally, he has approximately thirty-seven years of experience as an attending physician in emergency medicine. That experience includes evaluating patients in the emergency department who are experiencing pregnancy-related complications, including ectopic pregnancies. Pasternack testified that, although he routinely refers patients whom he suspects are suffering from ectopic pregnancy to the gynecology and obstetrics department, he does have experience evaluating and diagnosing individuals suffering from this condition. On these facts, I easily conclude that Pasternack is qualified to offer expert testimony regarding ectopic pregnancies. *See Gaydar v. Sociedad Instituto Gineco-Quirurgico y Planificacion*, 345 F.3d 15, 24-25 (1st Cir. 2003) (general practitioner qualified to testify as an expert regarding ectopic pregnancies; "[t]he mere fact that [the doctor] was not a gynecologist does not mean that he was not qualified to give expert testimony regarding [plaintiff's] pregnancy[;] . . . it would have been an abuse of discretion for the court to exclude [the doctor's] testimony on the sole basis that his medical specialty was something other than gynecology or obstetrics").

I turn next to defendants' challenge to Pasternack's causation opinion on the grounds that it is too conclusory and speculative to be admissible. (Docket # 37-37 at 53-57). In

making this argument, defendants urge the Court to disregard Pasternack's deposition testimony and confine its analysis solely to Pasternack's report. (*Id.* at 54). Although "[i]t is well-settled . . . that an expert's deposition testimony cannot cure a party's failure to include opinions in their expert's report," *Clayton v. Katz*, 2015 WL 1500248, *5 (S.D.N.Y. 2015), Pasternack did not offer any new opinions during his deposition. Rather, he merely "provid[ed] additional information or elaborate[d] on previously expressed opinions" that were within the scope of his report. *Chart v. Town of Parma*, 2014 WL 4923166, *20 (W.D.N.Y. 2014). Such elaboration is permissible. *Id.*; *Harkabi v. SanDisk Corp.*, 2012 WL 2574717, *3-4 (S.D.N.Y. 2012) ("an expert can offer evidentiary detail at trial for opinions expressed in the expert's report[;] . . . [Rule 26] does not limit an expert's testimony simply to reading his report[;] … [t]he rule contemplates that the expert will supplement, elaborate upon, explain and subject himself to cross-examination upon his report") (internal quotations omitted).

Defendants challenge as fatally conclusory and speculative Pasternack's opinion that Overstreet's ectopic pregnancy would have been diagnosed during or shortly after her period of incarceration had she received appropriate medical care during her Jail detention. (*Id.* at 54-55). This challenge ignores other opinions in Pasternack's report, including his opinion that Miller's advice deviated from the standard of care and contributed to the delay in the detection of her condition. (Docket # 37-24 at 5-6) ("[t]he reported statement by [Miller] to [Overstreet] that she probably is having a miscarriage and it would pass represents a deviation from the standard of care expected from a health care professional[;] . . . [e]arly detection and treatment reduces mortality and improves functional outcome[;] . . . the [Jail's] procedures prevented [Overstreet] from receiving timely care while she was incarcerated, and contributed to her delayed care once she was released from the Jail"). As Pasternack explained during his deposition, Miller's

statement to Overstreet contributed to the delay in diagnosis because Overstreet was discharged without a treatment plan and was not informed of the potential risks of her condition to herself. (Docket # 37-25 at 80-81, 87-88, 94-97). Importantly, Pasternack explained, the availability and efficacy of non-surgical treatment decreases as a person's pregnancy progresses. (Docket ## 37-24 at 5 ("[e]arly detection and treatment reduces mortality and improves functional outcome"); 37-25 at 49, 53, 86).

These opinions, which address both the proper standard of care and proximate cause – appear central to Overstreet's malpractice claim against Miller (Docket # 37-26 at 15-16) and do not seem to be challenged by Miller. These opinions would assist the jury in evaluating this case, and the Court discerns no basis to preclude Pasternack from offering them. Further, I find that these opinions are sufficient to create a triable issue of fact whether Miller's advice to Overstreet deviated from the standard of care and whether such deviation – by contributing to the delay in her diagnosis – caused Overstreet's injuries. *See Lesniak v. Stockholm Obstetrics & Gynecological Servs., P.C.*, 132 A.D.3d 959, 961 (2d Dep't 2015) (issue of fact precluded summary judgment of malpractice claim for loss of fallopian tube; "plaintiff's expert opined that the plaintiff was exhibiting symptoms of an ectopic pregnancy when she presented at the hospital, that the delay in her treatment was a departure from accepted medical practice, and such departure was a proximate cause of the plaintiff's injuries"). Even defendant's expert opines that if Overstreet had obtained multiple bHCG levels, "it is possible, although not guaranteed, that [Overstreet] could have been diagnosed with ectopic pregnancy during a time period when non-surgical intervention was an option." (Docket # 37-36 at ¶ 28).

Unsurprisingly, Miller contends that Overstreet's failure to obtain a subsequent bHCG level, as recommended by AOG, was "an intervening, superseding cause for

[Overstreet's] alleged injury[,]" which "breaks any causal connection between [Miller's] alleged malpractice and [Overstreet's] subsequent surgical intervention." (Docket # 37-37 at 51). I cannot find as a matter of law that Overstreet's failure to obtain a subsequent bHCG level was an intervening or superseding act that broke the causal nexus. *See Morrison v. Hindley*, 221 A.D.2d 691, 694 (3d Dep't 1995) (citing *Derdiarian v. Felix Constr. Corp.*, 51 N.Y.2d 308, 315 (N.Y. 1980)). Rather, factual questions permeate that determination that are appropriately left to the jury to evaluate, including whether Overstreet reasonably relied upon Miller in determining that forgoing a second bHCG lab would not pose a risk to her health. *See id.* (fact question whether plaintiff reasonably could have been expected to ignore former physician's advice precludes summary judgment).

   I reject Miller's remaining challenges to Pasternack's report. (Docket # 37-37 at 55-57). First, Pasternack's deposition testimony makes clear that he was aware that Overstreet had obtained a bHCG level prior to treating at Planned Parenthood and that she "had been noncompliant with some of the discussions that she had and that she hadn't done exactly what they told her to do." (Docket ## 37-25 at 91-93, 97; 37-37 at 55). Whether Pasternack reviewed the AOG records or improperly assessed Overstreet's mental or cognitive status are appropriate subjects for cross-examination that go to the weight, not admissibility, of Pasternack's testimony. *See Arista Records LLC*, 2011 WL 1674796 at *7 ("[a]rguments about the assumptions and data underlying an expert's testimony go to the weight, rather than the admissibility, of that testimony").

   For these reasons, I deny Miller's motion to preclude Pasternack's opinion testimony at this time.[16]

---

[16] At oral argument, defendants' counsel suggested that his preclusion motion may rest on a narrower basis: that Pasternack should not be permitted to testify that Overstreet's ectopic pregnancy would have been

49

C. **Miller's Remaining Contentions**

Miller's remaining arguments seeking dismissal of the malpractice claim against her are equally unavailing.  Without citation to any legal authority, Miller maintains that she cannot be held liable for malpractice because any alleged advice she gave to Overstreet was "outside the scope of any alleged physician-patient relationship for the provision of medical care."  (Docket # 37-37 at 49).  Further, Miller maintains that Overstreet is unable to demonstrate that she relied on Miller's advice.  (*Id.*).  Miller also contends that Overstreet has provided inconsistent testimony and affidavits regarding her post-release care, although she does not identify any particular inconsistencies.  (Docket # 48 at 10).

Overstreet submitted a responsive affidavit affirming that she understood Miller's advice to be that a miscarriage was inevitable and that her health was not in danger whether or not she obtained post-release medical care.  (Docket # 43-7 at ¶¶ 33-34).  These statements are sufficient to raise triable issues whether Overstreet reasonably understood the statements by Miller, the Jail's nurse, to be medical advice within the scope of a physician-patient relationship and whether Overstreet relied upon that advice.  As Overstreet's affidavit makes clear, she claims that her decisions regarding the course of her post-release treatment, including whether to adhere faithfully to the recommendations provided by AOG, were influenced by Miller's advice.  (*Id.*).  It is for the jury to assess the credibility of that claim, just as they will evaluate the

---

diagnosed before or imminently after her release from jail if she had received proper medical treatment in jail.  First, it is unclear whether Overstreet will seek to offer such an opinion considering that the only defendant remaining on the malpractice claim is Miller, who, according to Overstreet, did not learn until the day of her release from jail that she was bleeding.  As noted *supra*, however, expert testimony on this topic may be required to the extent Overstreet wishes to pursue damages relating to the loss of her fallopian tube in connection with her deliberate indifference claim against the officers.  (*See supra* n.15).  Second, it is unclear whether Overstreet understood that Miller was making this narrow argument on defendants' summary judgment motion.  (*See* Docket # 37-37 at 52-57).  Accordingly, Overstreet is directed to file written notice by no later than April 12, 2019, stating whether she intends to offer an opinion from Pasternack on that subject.  If so, Miller may file a formal motion *in limine* pursuant to Rule 702 of the Federal Rules of Civil Procedure by no later than April 26, 2019.  If such a motion is filed, the Court will issue a motion scheduling order affording Overstreet an opportunity to respond and be heard on the motion.

conflicting claims whether Miller saw and interacted with Overstreet at the Jail on September 10 and 11, 2012.

## CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment (**Docket # 37**) is **GRANTED in PART and DENIED in PART**. The Clerk of the Court is directed to enter judgment in favor of the County, Thompson, John Doe, Santelli, Nurse Lisa, Jane Doe and Crane. The following claims remain pending (1) Overstreet's Section 1983 Fourteenth Amendment claim for deliberate indifference against defendants Wilson, DeWind, and Miller; (2) her state law medical malpractice claim against Miller; and, (3) her state law claims for negligent infliction of emotional distress, intentional infliction of emotional distress, and negligence against Virts. Plaintiff is directed to comply with the Court's direction to supplement her expert notice as explained more fully herein at footnote 16.

A _trial date status conference_ will be held with the undersigned at 2310 U.S. Courthouse, 100 State Street, Rochester, New York on **April 30, 2019**, at **11:40 a.m.**

**IT IS SO ORDERED.**


_s/Marian W. Payson_
MARIAN W. PAYSON
United States Magistrate Judge


Dated: Rochester, New York
        March 25, 2019